The next case called for argument is in the interest of M.B.H. Counsel? May it please the court? My name is Twyla Warren. I practice out of Eppingham. This case involves an appeal from both an adjudicatory and a dispositional order out of Fayette County, Illinois. I was appointed to represent Penny Kickey, who is here with me today. Following the dispositional order in the case, Penny adopted her biological granddaughter, Montana, as did her husband, Butch, after a thorough background investigation. That was in early 2009 when the adoption was actually final. She went through an FBI investigation. She went through a home evaluation by a DCFS agency. And anyway, everything was finalized in that adoption, like I said, in February of 2009. In September of 2009, DCFS came in and took Montana from Penny. Montana was five years old at the time. The allegation was that Penny's husband, Butch, had hit Montana on the left side of her face and caused a bruise. The only allegation against Penny was that she had left Montana with Butch. There were no allegations that she knew Butch had hit her, had hit the child. There were no allegations that she should have known. In fact, she denied knowing that there was anything that had happened between Butch and Montana. And she testified that, in fact, she didn't leave the child with Butch. In any event, the court adjudicated Montana a ward of the court in November of 2009. Butch and Penny were represented both by the same attorney at that hearing. And I want to say from the outset that there are many types of personalities in this world. Penny is a unique personality. I don't think she would be offended by my saying that. Penny is very assertive. She's not one to back down. She's one to be very assertive with regard to her rights. She expects things from her attorneys. Aggressive representation. Trust me, I believe that. I know that. She has adamantly maintained her innocence throughout this case. She says, I did nothing wrong. The court found that she neglected Montana by leaving Montana with Butch, but nobody ever said that she knew that that was a wrong thing to do or that she thought Butch was violent or anything along those lines. Penny's a very strong-willed woman. Again, she, throughout this matter, has very much maintained her innocence. She's not the type of person that DCFS appreciates. I guess that's saying it mildly. DCFS seems to appreciate the more compliant type. If they say something's to be done, you better do it. It doesn't necessarily matter to them if it relates to the case or relates to maybe the problem or the issue of the matter.  You're not supposed to question. Penny questions. That's just her personality. In any event, the adjudicatory hearing was held in November of 2009. Penny testified at that time. She said that Montana had stayed with the babysitter on a Saturday, Sunday, and after school on both Monday and Tuesday. That was August 29th to September 1st in 2009. When the child returned home after school on Tuesday, Montana was telling Penny, hey, at school they took my picture. They said I had a bruise on my face. Penny said, well, what happened? She said, well, I fell out of bed last night. Penny testified at the adjudicatory hearing that Montana actually took her to her bed and showed her on the bed where she had fallen out of bed and hit her face. Penny was still a little concerned. She wanted to make sure that Montana was safe. She didn't know what was going on at school. No one had called her at that point. So what she did was she contacted her niece in Michigan, and she arranged for Montana to be safe until she sorted through all of this. So Montana went to Michigan with the niece. We have our first story, and that is that Montana fell out of bed, and that caused the bruise. Apparently at school she had talked to the principal. She told the principal that Papa hit her in the face because he was mad since she had gotten in trouble at school. That same day she talked to a DCFS investigator and said her father had hit her because she stepped on the dog's tail. So right there we have three different stories. Another story that was indicated at the adjudicatory hearing by Penny was that she was concerned with regard to Anthony Flayton. Anthony was a teenage boy who was the son of the babysitter. And you might remember my indicating that for four days, at least two full days and then after school on a couple of days, Montana had actually been at the babysitter's home. Penny was concerned about Anthony Flayton. She had reason to believe that there was a suspicion about him anyway. DCFS actually went to the babysitter's home. They interviewed the babysitter. The babysitter all of a sudden became defensive and said, I was afraid of what might happen or what might be said, so I took pictures of that bruise. Out of the blue she makes such a statement. What's really odd is that even though DCFS knew that my client was concerned with regard to Anthony Flayton, and Anthony was right there in that babysitter's home living, they didn't talk to him. He's a teenager. They didn't talk to him until over a month later they went in to interview him. So there are four possibilities that were presented at the adjudicatory hearing. Penny testified that Butch was never alone with Montana. Still the court found that Butch hit Montana, and thus the child was abused. Although there was no evidence of the same, the court also found that Penny left Montana with Butch, and thus the child was neglected. Attorney Ed Potter represented both Penny and Butch at the time, but afterwards the court found that Attorney Potter had a potential conflict of interest, so separate attorneys were then appointed for the parties. Penny wanted aggressive representation. She said over and over again, she just wants someone who has her best interests at heart. I don't think that's too much to ask for. This is her child they're taking away from her. She deserves aggressive representation. She's not necessarily an easy party to please. I will be the first to admit that. She expects a lot. She had different attorneys appointed for her. How many? I believe there were four, Your Honor. I think Ed Potter was the first, and there were probably three after that. They withdrew. They would file motions with the court indicating why. Those motions were not verified. There was never any testimony presented, no evidence or anything such as that. Yet the state throughout this proceeding wants to blame Penny for the withdrawal of all those attorneys. Quite frankly, she was just wanting good representation and representation that had her best interests at heart. Those were the words that she used very often in this case. In any event, the court ruled against her at the adjudicatory hearing, and on her behalf, actually, she adopted Butch's motion to rehear, retry, or vacate the finding of adjudication. She filed that motion, and it was set for hearing together with the dispositional hearing on July the 12th. She went in and she requested counsel to represent her at that motion. It was denied. She went forward with that motion on her own. She lost. She also went forward with the dispositional hearing on her own because she didn't have a choice. The court wouldn't give her an attorney. She lost again. There were a lot of things said by the court at that July 12, 2010 hearing. Shortly after the hearing and after the judge made the rulings, and I don't want to go into a lot of detail about what was said, but let me just give you an idea. At one point in time, the judge told Penny to shut up on the record, but it's more than that. I think the judge recognized that he was in the wrong because what he did shortly thereafter was he vacated his order. He said that his remarks created the appearance of prejudice and bias, so he vacated those and he recused himself. That was in July of 2010. Over a month later, the case was set again. Keep in mind, they took her child away from her in September of 2009, so the child is still away from her all of this time. Then August 25, 2010, we're back. We're going through the hearings again, the motion to rehear and the dispositional. Again, Penny was pro se. She requested an attorney. She indicated on the record that she had called the clerk's office two weeks prior and that the clerk told her that the judge said she did not deserve an attorney. The judge later denied that, said that that wasn't true. She shows up at the hearing. She asked for an attorney. That was denied, so she had no choice. She went forward and represented herself at the motion to rehear, first of all. She started telling why she didn't trust DCFS. She said that they had withheld evidence from her of a rape kit that had been done on Montana involving Anthony Flayland improperly touching Montana. They said that she also said that DCFS withheld evidence about how Flayland had thrown Montana down the stairs.  She was so desperate to get some evidence of what really happened because she was getting limited time with this child. So she gets out a tape recorder, a video player actually, and she tries to video the child as the child is trying to tell her what really happened. The DCFS worker just goes crazy and says, And from that point forward, her visitations were restricted, and it got worse. She explained that she felt DCFS was trying to retaliate against her. Anyway, she gave all of these reasons to the court, but it didn't matter. The court denied her motion to rehear. She wanted to have that adjudicatory hearing heard once again, but the court wouldn't do that. Which judge was that now? The second dispositional is Judge Sanders. Penny then proceeded to the dispositional hearing after her motion to rehear was denied, and she explained that she didn't feel like she needed to comply with the service plan. Oh, gosh, those are terrible words for anybody to say because, as we all know, DCFS expects strict compliance with their service plans even if they don't really relate to the case. One thing they wanted was a psychological evaluation. Penny had just had that just a few months prior as part of her home study for her adoption, but that wasn't good enough. Penny said, I told them that I would get my own, and they said no. I couldn't get my own. So she goes to her own doctor, and she says, write me a letter. She presented that letter from the doctor who knew her well, and that letter said Penny doesn't have any mental illness, but yet DCFS felt like that wasn't good enough. Penny also testified as to other reasons why she didn't think she should have to go through every single provision of their service plan. She didn't trust them. She said they denied her visits, denied her phone contact with her own child. They refused to let Montana have gifts that she had taken to her such as an Easter basket. They took, Penny said, a photograph that Penny had given Montana of Penny and Montana together. They took it away from her, and they took it away as punishment to this child, took away a family picture to punish the child. And then they refused to transport the child anywhere close to where Penny was actually residing at the time. Later we find out that it was 85 miles they wanted her to drive. Now that might not seem like a lot to us because I'm sure you drive plenty just to get here, but Penny, her family income was around $700 a month. That's a lot, and she had a car with some problems. Under the circumstances, that was a great burden for her. The court found that she had not complied with the service plan. She failed to correct conditions, failed to show that she had a stable place to live. Basically, the court ruled against Penny at the dispositional hearing. And to make it even worse, and I brought this up as one of my arguments, the court was asked to make a finding that DCFS had made reasonable efforts to reunify the family. The court did over her objection, even though all the evidence that had been presented at the dispositional hearing was just to the contrary. The only thing that the court could have looked at at that time would have been written reports that were filed with the court without foundation, hearsay documents just placed in the court file. I argued with myself as to whether to make this argument or not, but I'm going to, just to say. I have two kids, and they're in college. But it's not been that long ago since they were minors. I would have gladly gone to prison to keep from uprooting my kids from home. I would have, if that's who I come down to. To send me to prison, the evidence would have had to have been very compelling, beyond a reasonable doubt, couldn't have been hearsay, couldn't have been without foundation, had to be pretty compelling evidence. Yet, in my opinion, it's more serious if you take your child away. But yet, DCFS can come in and just file the reports anytime they want. The court can rely on those to make findings. Sometimes it doesn't even show, in this record anyway, that Penny received copies of those things that were being used against her. Now, back to my arguments. One of my first ones was that the court did find that DCFS was making reasonable efforts toward the goal of return home. There wasn't any evidence presented at the hearing other than whatever reports were on file with the court and the evidence that Penny presented, that they weren't making reasonable efforts, they were almost working against her. If the documents were relied upon by the court to make those findings, Penny didn't even have the opportunity to really controvert any of those documents because there was no evidence that she even received them or understood them, and she was pro se, so that made it even more difficult. It was contrary to the evidence presented by Penny, as I indicated earlier. It was just unfair to her. The state would have you believe that it didn't make any difference. The court can make those findings anytime it wants. It doesn't make any difference. It didn't have any effect on the ultimate order. I don't really think that that's accurate because if it's the truth, then the result is that efforts to reunify for the lack thereof make no difference at all in deciding the ultimate disposition of the child, and I can't imagine that that's what the law is supposed to be or it is. Another argument that I've made is that Penny couldn't, Penny was not afforded her statutory right to counsel. I've touched on that briefly. It seems to me that if an attorney had a conflict after the adjudicatory hearing, nothing had really changed. He had it during and before the adjudicatory as well, but my stronger argument is that Penny had a right to counsel. It was hard for her, arguing that motion to rehear and the dispositional on her own, and why is it that directly following the dispositional order, the court's offered to appoint me to represent her. If she was entitled to an attorney after the dispositional, she should have been entitled to one before and during as well. It was difficult for her, and although under the circumstances it might appear as though she did a decent job pro se, she certainly would have done better with an attorney. My third argument was that the court failed to make specific and detailed findings to support a finding of unfitness and to make it clear to Penny what steps she had to take to correct the problems that caused the removal. There are statutes that specifically relate to the adjudicatory and the dispositional. Both require the court to put in writing a factual basis supporting the determination that it makes. For example, at the dispositional, the court said, the mother, P.H., is unwilling to care for, protect, train, or discipline the minor and, slash, or unfit. I'll tell you the word that's missing. That word is because. Simple as that. Why are those things accurate? Tell her why. Give her an explanation. Give her some specificity. Give her a solid starting point for making the corrections that were the cause of the removal of the child. The court just simply didn't do that. And I understand courts get busy. In larger areas, that's particularly true. They have a form, and they often check the blanks on the form. But they're taking a child away from a parent. Take the time to explain why. So that that parent knows what they have to do in order to get their child returned. It's pretty important. Very important. We also make the point that there was no dispositional hearing within the statutory timeframe. The child was removed from Penny on September 13th of 2009. The court didn't hold the dispositional hearing until December 22nd of 2010. It wasn't Penny's fault. The butch failed to show up in court several times. You can't blame her for wanting a good attorney to represent her interests. And you can't blame her for the delay that was caused by the judge when he gave the remarks that gave the appearance of prejudice and refused himself. There are several other points that I've made in my brief. I guess I shouldn't have made those additional arguments that I argued with myself about. But the bottom line, Your Honor, is that my client's been treated terribly unfairly in this matter. She's lost her child. They took her child away from her. I think that every possible safeguard should be implemented when that occurs. And it just wasn't here. Thank you. Thank you, Counsel. Counsel? Well, I hope when you consider the oral arguments in this case, you realize that nothing is true just because a lawyer says it's true. Many of the things in the oral argument presented on behalf of the respondent were from outside the record. For example, the matters concerning the adoption of this child by the respondent. Others, well, the attorney served as a mouthpiece presenting the respondent's somewhat skewed view of what occurred. I would ask that the court review my brief before accepting any representations made by counsel for respondent. We've read the briefs of both parties. Yes. Well, I think my brief gives a far more accurate description of what's actually in the record. Now, one consistent error in respondent's brief is she assumes that a finding of neglect and abuse must be based on the conduct of the individual parent who's contested. That's just not the law. As the Illinois Supreme Court said in Ray Arthur H. case, if a child is abused and the child is abused, and the court will so find no matter which parent inflicted that abuse. And if you think about it for five seconds, the rule has to be that way. I mean, if a father sexually abuses a daughter, then that is an abused girl. Whether or not the mother participated, the mother whips the child and leaves scars, then that's an abused child. Whether or not the father participated. Now, with respect to the sufficiency of evidence of abuse here, the photographs in the record show that this child was hit and hit very hard. There was an abuse, there was a bruise extending from behind the child's ear all the way to the center of her face. Kind of damage which should not be inflicted on any five-year-old child. And we know from numerous sources that it was the respondent father who put that bruise on the entire side of the child's face. That's what the child told the teacher at school. That's what the child told the DCFS worker. That's what the child told the police officer in Michigan after the respondent mother shipped the child off to Michigan. And indeed, it's never been explained why she would do that except for the purpose of evading the law or perhaps even protecting the child. So there was plenty of evidence to justify the finding of the trial judge that this was an abused child and a child whose environment was injurious to their welfare. It didn't take long for Montana to be abused in that home. She had been there for less than a year. And these were not her biological parents but her adoptive parents. Now with respect to representation by counsel, the record does show why the attorneys withdrew. And these statements by the attorneys were in no way contradicted by the respondent. Indeed, she wanted to get rid of him. Attorney Evelyn Potter withdrew because the respondent wanted a new lawyer and not because Potter had her best interests at heart. Attorney Patrick Shufflesberger wouldn't withdraw because the respondent did not want him as her lawyer. He attached that motion in an abusive email in which the respondent insulted him. Attorney Richard Day withdrew on the grounds that the respondent completely failed to communicate with him. Now, if she wanted a lawyer to represent her interests, then maybe she should have tried to communicate with Attorney Day. Attorney Jeffrey DeLong withdrew because the respondent failed to communicate with him and said that she did not believe that he was working for her. And the respondent said that she did not want him as her lawyer. So the trial court appointed four attorneys in succession to represent the respondent. And all of them said that they couldn't represent her because she refused to cooperate and she didn't want them as her lawyer. Now we can believe two separate propositions. One is that all the attorneys in Fayette County are conspiring against the respondent and don't do their professional duties. The other is that the respondent was trying to prevent the trial court from reaching a decision by firing all her lawyers. Well, that was a call for the trial judge to make, and the trial judge did make that call. Did she ever ask to proceed pro se? No. After firing four of her lawyers, all of her lawyers who withdrew, it was a mutual decision. She asked for a continuance to hire private counsel and delay proceedings a further three months later. The court had the option of denying the fourth lawyer's motion to withdraw. And I'm just, you know, these are the options available to trial judge. The case has to proceed. She hasn't asked to represent pro se. She wants this guy fired. But the court's ultimate decision is whether to allow him to withdraw. Why would that have not been the correct, or did the court actually have an option between the two? Well, attorney DeLong, who was the last of the four lawyers, said the respondent had failed to communicate with him. So how can you represent her if she won't talk to you? I mean, she never denied that. I mean, the case law is completely on my side on this particular issue. There's a case directly on point called Traverius O, in which, under exactly similar circumstances, except it involved a termination of criminal rights case, a father who fired three successive lawyers and refused to let them represent him was required to proceed pro se of the termination of criminal rights here. And look at what happens in criminal court. In criminal court, there's a constitutional right to counsel. Here, there's no constitutional right to counsel, although there's a statutory right in the juvenile court act. But even when there's a constitutional right to counsel, the courts have held that if you refuse to accept representation by successive appointed attorneys, unreasonably so, you can be forced to proceed pro se. So under the applicable case law, the judge had a right to do exactly what he did. And I think the trial court gave respondent far too much leeway rather than too little. I mean, we're in southern Illinois. Counties are not rich. How many thousands of dollars did these four attorneys charge? I know it was many thousands of dollars for representation that respondent simply refused to accept. I mean, at some point, there has to be a limit to how many appointed attorneys a respondent in a child custody case gets. Now, with respect to cooperation with the Department of Children and Family Services, one thing that counsel for respondent did not tell you is that cooperation with Department of Children and Family Services on behalf of this respondent was zero. There was no attempt at cooperation. There was no attempt to comply with any aspect of the service plans. It got to the point where the DCFS caseworker didn't even know where respondent was living, didn't even have a good address for him. It's not a case of a respondent parent trying to comply with or partially complying with the service plan or partially cooperating with the caseworker. It's no cooperation whatsoever. You know, you can, it's, I mean, DCFS is not perfect. God knows I've had my own problems with them, but DCFS was never even given a chance here. The respondent father and respondent mother explicitly and completely refused to cooperate with anything that the social workers offered them except temporarily for visitation. Now, the counsel for respondent has given you the mother's version of what happened at the McDonald's in Panama, but the version that the Department of Children and Family Services gave to the court, which the court was entitled to accept, is that respondent grabbed this little girl and ran through the McDonald's shouting that DCFS was trying to kidnap the child. And after that, DCFS said, since the child was a disturbed child in a difficult place, displaced in Springfield, Illinois, you'll have to visit in Springfield. And they offered, another thing the counsel for respondent didn't tell you, they offered to drive her to Springfield to see this child. And she refused to get in the car with a DCFS worker. That's how uncooperative she was. She refused to get a ride to Springfield with a DCFS worker to see her daughter, and indeed did not see her daughter for more than half the time between the adjudicatory hearing and the dispositional hearing. Okay, so DCFS says, well, if you won't get in the car with the social worker, we'll give you gas cards. She refused to drive to Springfield on her own. Now, if her car wasn't working, it would seem to me that she should have accepted the rides from DCFS. However, she was able to drive to court. So perhaps she should have attempted to drive to Springfield if she wasn't willing to accept a free ride. So this is, we talk about taking a child away from her mother. Well, this is not the biological mother. It's a nine-month adoptive mother who refuses to visit with the child. I would say the person who's taking away the rights of this child is respondent. DCFS was never given a chance to accomplish anything in this case. As to the findings of the court that reasonable efforts were made, the Juvenile Court Act says that in a permanency hearing and a dispositional hearing, you can rely on written reports. It specifically authorizes the guardian to make written reports. Therefore, you can make that finding that DCFS made reasonable efforts on the basis of written reports. That's the whole plan of the Juvenile Court Act. Once there's an adjudication in neglect, the court can consider social work reports in making its findings. In any event, as I point out in my brief, those findings were just to preserve federal funding for Montana's foster care and had no effect on any adjudicatory or dispositional order. Now, as to the statutory time frame, it's quite true that the Juvenile Court Act says that the dispositional hearing should take place within six months, and it's quite true that this dispositional hearing took place a year after the adjudicatory hearing. But it's also true that every case cited in either brief says that a delay beyond the six-month period doesn't deprive the court of jurisdiction to enter a dispositional order. So the order's valid whether it took place six months or one year after the dispositional hearing. And I think I've said enough to show you that it was the conduct of respondents, the father by not showing up in court and the mother by constantly firing her attorneys, which caused a delay in the dispositional hearing. Certainly the people in DCFS were not responsible for that delay when we were ready for a dispositional hearing and answered ready for a dispositional hearing well within the six-month period. Now, as to the findings of the trial court, we have two sets of findings at issue here, the findings of the adjudicatory hearing and the findings of the dispositional hearing. And the Juvenile Court Act has different requirements for the findings. For a finding of an adjudicatory hearing, the Act says that the court should specify the reasons for the finding. And the court did do that orally, although not in the written order. It's a check-the-box sort of order. The oral findings specifically stated that the child was found to be abused because the father hit her on the side of the face. Now, the Leona W. decision of the Illinois Supreme Court says that when the court's oral findings are sufficient, it does not matter that the written findings following the adjudicatory hearing were not specific. So, again, I have the Illinois Supreme Court directly on my side on that point. Now, with respect to the dispositional hearing, the Juvenile Court Act says that there shall be a written order, written findings. There were written findings here. They were general findings. There's nothing in the Act that says they have to be more specific. And I was – if you – so the written order of the court, which is the same kind of order I've seen in dispositional orders in most – almost all of the child neglect cases I've handled, it was sufficient under the Juvenile Court Act, and any defects in any event didn't matter because, as I said, the evidence in the dispositional hearing did not show partial failure to cooperate with the caseworker, did not show partial failure to comply with the service plan. It showed a deliberate decision to not even communicate, to not cooperate, to do nothing to get this child back except temporarily visit with the child. And even that was changed around when the respondent refused to visit with the child later after the adjudicatory hearing. So there's nothing in the Juvenile Court Act which says that if the respondent doesn't like DCFS, they can totally refuse to comply with the service plan, communicate with the – or communicate with the caseworker. It's very common for somewhat mentally unbalanced respondent parents to blame DCFS for their troubles. But the record in this case doesn't support that. DCFS was never given a chance. There was no cooperation. For these reasons, Your Honor, we ask that the adjudication of abuse and neglect at the dispositional order be deferred. Counsel? Counsel? The state says that DCFS wasn't given a chance. Penny tried to explain why she didn't comply or she didn't go along with all their provisions. She did that in her testimony when she said they withheld evidence of abuse and molestation of her daughter. They refused to allow her to videotape when her daughter was telling about the incident. And then they lied, she said, about what actually occurred on that occasion. They fabricated allegations about sexual exploitation. Penny testified to that. She said they changed her police records. And then she said they were caught. She said they refused to drive Montana to her area. They refused to give her visits. They refused to have telephone calls allowed with Montana and Penny. They refused to give her gifts that Penny had made. I mentioned this before. They refused to give her family pictures. Took them away from her as punishment. And Penny said they allowed the child to be abused four times while the child was in DCFS care. When you think about all those reasons that she gave and more, it should be no surprise that she had very little, if any, trust in DCFS. If the court will look at the pictures, the photographs in the case of the child, there is one report, and I'm sorry that I can't give you the specific site, but there's one report that relates to a picture. And in the report, it refers to an October of 2009 occurrence at a foster home. It's Penny's position, was Penny's position, that the bruise that's shown in the photograph at issue actually occurred in the foster home, one of the pictures. There were, I believe there were two pictures of the child. Now, there was testimony about a bruise that occurred in September, August, September of 2009. But there's also some evidence in the file about another bruise. You don't dispute the fact that there's evidence in the record to support what the state's saying. You're just arguing it's against the manifest way to the evidence. That's correct, Your Honor. Correct. The state would have you believe that the child was placed with my client and then automatically she's injured, and that's just not the fact. The adoption was finalized in February of 2009, according to the record, and it was September 2009 that the child was taken away. Although it's not clear in the record when the child was actually placed with Penny, it certainly wasn't on the day that the adoption was finalized. That's just not the way it works. So there was a period of time that the child was just fine in my client's care. Under the circumstances, we still believe that Penny's just not been treated fairly in this matter. She's maintained her innocence all along. She, under the circumstances, were given attorneys who she felt were not adequately representing her. She was not given timely hearings. She was expected to comply with the demands of a state agency that had fabricated allegations against her, refused to work with her in any respect. She felt like they were against her, not working for her. She tried to comply on her own by getting her own doctor's report and offering to get her own psychological, but that was never good enough. She offered alternative theories on how this bruise may have occurred, but everybody ignored her. It seems like that even DCFS failed to investigate or failed to disclose evidence to her when she did tell them of a different possible alternative. And in the end, the court made findings that the agency, DCFS, had made reasonable efforts to reunify the family. That just wasn't the case. Thank you. Thank you, counsel. We appreciate the briefs and arguments of counsel. We'll take the case under advisory.